**PEOPLE OF THE TERRITORY OF GUAM, Plaintiff–Appellee,**

v.

**John Benjamin SHYMANOVITZ, Defendant–Appellant.**

No. 96–10467.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1997.

Decided Aug. 31, 1998.

As amended Oct. 14, 1998.

David J. Highsmith, Highsmith & O'Mallan, Agana, Guam, for Defendant–Appellant.

David M. Moore, Assistant Attorney General, Agana, Guam, for Plaintiff–Appellee.

Before: REINHARDT, LEAVY, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge:

In this case we consider whether the prosecution may present testimony regarding the contents of sexually explicit gay adult magazines that are found in the residence of a defendant who is being tried on charges of unlawful sexual activity with minors. John Benjamin Shymanovitz appeals his conviction of multiple counts of criminal sexual conduct involving children, assault, and child abuse, on the ground that his trial was tainted by the admission of such testimony, as well as by the admission of the actual texts of two of the articles. Because we agree that the ad-mission of this evidence constituted prejudicial error, we reverse the convictions.

## BACKGROUND

Shymanovitz was a middle-school guidance counselor. He began taking a group of boys who attended the school on outings, such as hiking and camping trips, and sometimes had them sleep over at his home. Shymanovitz was charged with sexually and physically abusing seven of the boys while they were under his supervision. Several months later, he was charged with similar offenses relating to four more boys. The two indictments were then joined.

Prior to trial, the government filed a motion in limine requesting permission to introduce into evidence two articles from sexually explicit magazines found in Shymanovitz's residence, on the ground that they were relevant to establishing Shymanovitz's intent to commit the offenses. The court deferred ruling on the motion but at trial permitted a police officer, Winnie Blas, to testify that at Shymanovitz's house she seized, among other things, the following: condoms, a box of surgical gloves, a tube of K–Y Jelly, some children's underwear, a calendar, and six sexually-explicit magazines. Of the six magazines, four were entitled "Stroke"; one was entitled "After Midnight"; and one was entitled "Playboy." Officer Blas testified in great detail, over defense counsel's objections, as to the contents of the four issues of "Stroke"; she told the jury that they contained photos of men masturbating; performing auto-fellatio; ejaculating; using sex toys; wearing "leather equipment"; paddling one another; and having oral and anal sex. She also described two articles from the "Stroke" magazines, which had been the subject of the motion in limine. The articles consisted of presumably fictional tales and described two couples engaging in sexual conduct: the first, a father and son; the second, a priest and a young boy.[1] The two articles, the K–Y Jelly, and a page from the calendar were entered directly into evidence.

---

1. Printed statements at the top of each article warned that sexual activity with minors was illegal.

During her initial closing argument, the prosecutor vigorously argued to the jury that the articles demonstrated that Shymanovitz intentionally engaged in the conduct of which he was accused:

And the acts that are portrayed in that article are acts that, if you look at what the Defendant himself has done, or what he is charged with, that it goes to his knowledge that he's aware of these kinds of facts, *that it goes to his intent to engage in these kinds of acts, that it goes to his motivation to get involved in these types of acts.* . . . .

. . . . How does it all go fit in? Again, members of the Jury, it goes to the same thing, that this Defendant knows about these types of facts, *that this Defendant was motivated to perform these types of acts.*

(Emphases added). She recounted the testimony about the content of the "Stroke" magazines in great detail:

[Officer Blas] talked to you about these magazines. She was asked to describe the contents of these magazines. She told you there were a total of six magazines, four of which were entitled "Stroke," S–T–R–O–K–E, is how she spelled it. She told you about those magazines. She said there was also one "Playboy" and one "After Midnight" magazine. Now in the "Stroke" magazine, she testified that those magazines contained photographs of men ejaculating. When we asked her, "Well, 'ejaculating,' what do you mean?" "Semen coming out of their penis." She talked to you about there are men masturbating, men with men, having oral sex, and anal sex, men's penis being inserted into the anus of another male individual, or an object being inserted into the male anus. She said that it also had photographs of— that depicted the use of mechanisms, and when she was asked, "What do you mean by 'mechanisms,' " she said, "Well, other objects besides a penis and a finger, such as dildos."

"Well, what are dildos?"

"They're shaped like a penis, rubber-like instrument, dome-like top."

She talked about balls on a string; that they're inserted into the anal cavity, and they're pulled out one by one. She also talked about paddles being used on the butt, and so she testified to that. She talked about leather clothing, ja- — people wearing jackets and pants with openings on the penis and the anus, or anal area.

Near the end of her initial closing, the prosecutor emphasized that Shymanovitz and his female roommate were merely friends but not engaged.

Finally, in her rebuttal argument, the prosecutor returned to her theme:

[D]on't let the fact that these magazines were found in his possession fool you as not being important because I told you what the importance was of those magazines. It's the acts that are depicted in the magazines that Officer [Blas] testified to. The acts—the fellatio, the anal intercourse, the touching—the acts that she described to you are important. That's why it's relevant, because it does go to the Defendant's intent, his motivation; his claim that he doesn't do anything or that he doesn't have any knowledge that certain things might be illegal. The articles are important because they were found in those magazines that were in his possession. Those magazine articles said on the very top how it's illegal to have sex with children. . . . So, it is important and it goes to his intent and motivation.

Aside from the evidence at issue here, the government's case consisted principally of the alleged victims' testimony. Shymanovitz, however, denied any sexual contact with the minors. His counsel argued that the boys and some of the parents had concocted the allegations against him for a number of reasons. He pointed to the testimony of two of the boys who had testified before the grand jury that Shymanovitz abused them but then testified at trial that they had made up the allegations.

The trial lasted three weeks. On the fourth day of deliberations, after the jury indicated it could not reach a verdict, the trial judge read it a modified *Allen* charge. On the next day of deliberations, Shymanovitz was convicted on twenty-seven counts and acquitted on eight. He was sentenced to four consecutive terms of life imprisonment for first degree criminal sexual conduct, plus twenty-one years for his convictions on sec-

ond, third, and fourth degree criminal sexual conduct.

## DISCUSSION

Shymanovitz contends that the district court abused its discretion when it permitted the prosecution to adduce oral testimony regarding the contents of the "Stroke" magazines that were seized from his house and to introduce into evidence the texts of the two "Stroke" articles.[2] He further argues that the government's only purpose in doing so was to prejudice the jury by suggesting that he was a homosexual.

We first note that none of the explanations the government proffered during closing arguments for offering the evidence regarding the magazines or introducing the articles is plausible. Although the prosecutor argued primarily that the reading materials in his home proved that Shymanovitz knew that certain forms of sexual conduct were illegal, the defendant never testified at trial that he believed sexual conduct with minors to be legal. Nor was there testimony to indicate that he somehow lacked knowledge of or familiarity with fellatio, anal intercourse, or other general aspects of homosexual sex. Moreover, neither knowledge of the illegality of the conduct of which he was accused nor knowledge of the nature of the specific acts identified by the prosecutor constituted an element of the offense. More important, such knowledge would in no way tend to prove his guilt on any of the charges brought

against him. Accordingly, it is highly unlikely that the government introduced the magazines to address the issues it argued they were relevant to during the prosecutor's closing arguments. In any event, the government no longer pursues these justifications on appeal.[3]

The government now contends only that the introduction of the challenged evidence was proper under 6 Guam Code Ann. § 404(b) in order to show that Shymanovitz "intentionally engaged in sexual contact for the purpose of sexual arousal or gratification." With one procedural exception that is not relevant here, Guam's Section 404(b) and Rule 404(b) of the Federal Rules of Evidence are identical and must be construed identically.[4] We will next carefully examine the government's 404(b) argument.

There were two categories of charges of sexual misconduct in this case: those involving "sexual penetration," 9 Guam Code Ann. §§ 25.15 & 25.25 (West 1996), and those involving "sexual contact," 9 Guam Code Ann. §§ 25.20 & 25.30 (West 1996). The sexual penetration charges simply require that the defendant "engage[ ] in sexual penetration with the victim" but do not include any requirement that the defendant act with intent.[5] "Sexual contact," however, incorporates an element of intent in its definition:

Sexual Contact includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of

2. The government attempts to downplay the officer's testimony by arguing that evidence regarding the magazines was never admitted. The record is to the contrary; the officer testified at great length about the contents of the magazines. It makes no difference whether the evidence was admitted as demonstrative or testimonial evidence—the effect is the same.

3. The government also does not contend, nor was there evidence at trial to indicate, that the "Stroke" magazines were used as "instruments" of the alleged offenses. Cf. United States v. Yazzie, 59 F.3d 807, 811 (9th Cir.1995) (admitting magazines and penis-enlargement pump when victim testified that these items were used during alleged sexual activity). Only one of the children testified to having seen an adult magazine, which he described as depicting heterosexual activity.

4. Under 6 Guam Code Ann. § 404(b), otherwise inadmissible character evidence may be admitted if it is used to prove "motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident." Section 404(b) is identical to the Federal Rule except that it omits the requirement regarding advance notice of an intent to use such evidence. With this one exception, the Guam statutory provisions pertinent to this case are both worded and numbered in the same way as the Federal Rules of Evidence. Accordingly, while our references to Rule 404 hereafter are actually to the Guam Code, our analysis and holdings apply equally to the Federal Rule. The same is true with Guam Code Sections and Federal Rules 401, 402, and 403.

5. Guam law defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another...." 9 Guam Code Ann. § 25.10(a)(9) (West 1996).

the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification.

9 Guam Code Ann. § 25.10(a)(8) (West 1996). Thus, the charges based on sexual contact require the government to prove that any touching on Shymanovitz' part was intentional, and that a reasonable person could construe the touching to be for a sexual purpose.

■ Whether Shymanovitz's *actual* purpose in touching the alleged victims was sexual arousal or gratification, however, or whether he was *actually* aroused or gratified by the touching is immaterial to the offenses, including the charges based on improper sexual contact. Instead, the question in the latter category of cases is whether a reasonable person could construe the touching to be for such a purpose. The test, under the sexual contact statute, is an objective not a subjective one. In short, it is the character of the touching that is at issue, not the purpose of the intentional toucher. Accord-

ingly, the government's current and sole justification for admitting the challenged evidence goes, once again, to the proof of an element immaterial to the offense.[6]

There are even more fundamental reasons why the "Stroke" magazines and the fictionalized articles were inadmissible.[7] The mere possession of reading material that describes a particular type of activity makes it neither more nor less likely that a defendant would intentionally engage in the conduct described and thus fails to meet the test of relevancy under Rule 401. This circuit has never held otherwise. Indeed, the government relies on—and we have found—no cases from this or any other circuit in support of its position to the contrary.[8] Specifically, in this case, neither the defendant's possession of the "Stroke" magazines, nor of any of the articles contained therein, was probative of whether the touching of the alleged victims' genitals was intentional or whether the touching actually was or could be construed as being for sexual purposes.[9] At the very most, Shyma-

---

6. Although the government's brief does not acknowledge a difference between the terms "intent" and "motive," its arguments are inapplicable to the motive exception under Rule 404(b). We have long held that evidence of motive requires more than a general propensity to commit a type of crime but rather a motive to commit the crime charged against the particular victim. *See United States v. Brown*, 880 F.2d 1012, 1015 (9th Cir.1989) (finding evidence of "thrill from creating violence" to be inadmissible as motive evidence for murder charge); *cf. United States v. Bradshaw*, 690 F.2d 704, 708–09 (9th Cir.1982) (finding evidence of prior sexual acts between victim and defendant to be admissible as motive evidence for kidnapping).

7. It is elementary that all evidence, including Rule 404(b) evidence, must meet the test of relevancy as described in Rule 401, or the evidence is inadmissible under Rule 402. *See United States v. Brooke*, 4 F.3d 1480, 1483 (9th Cir. 1993).

8. Instead, it relies on three cases involving sexual offenses against children that arose from the military courts. *See United States v. Proctor*, 34 M.J. 549 (A.F.C.M.R.1992) (admitting picture books depicting nude girls on the ground that they show defendant "had the requisite sexual desire during his conduct with the children"); *United States v. Orsburn*, 31 M.J. 182 (C.M.A. 1990) (admitting paperback books describing sexual activity with children); *United States v. Mann*, 26 M.J. 1 (C.M.A.1988) (admitting sex manual depicting young children engaging in sexual activity). First, we note that in each these

cases the court found the evidence at issue to be relevant to whether the defendant "committed the acts with *the intent to arouse, appeal to, or gratify the lust, passions or sexual desires of the accused, the victim, or both."* *Proctor*, 34 M.J. at 556 (emphasis added); *see Orsburn*, 31 M.J. at 187; *Mann*, 26 M.J. at 4. As discussed above, whether Shymanovitz actually intended to gratify his or others' sexual desires was immaterial to any of the charges brought against him. Second, and more important, as explained further in the text, we disagree with these cases' holdings that a defendant's possession of reading materials depicting or describing criminal conduct tends to establish that the defendant engages in or has engaged in such conduct.

9. The government contends that because the two articles depict acts similar to the offenses charged, they are admissible under *United States v. Todd*, 964 F.2d 925 (9th Cir.1992). In *Todd*, we held that a photograph of a defendant charged with masturbating in front of minors, which depicted him masturbating in a particular manner and setting, was admissible under 404(b) as *modus operandi* evidence because the mise-en-scene depicted in the photo was consistent with victims' description of his conduct and also because its very existence "evince[d] a willingness to masturbate in front of other persons and/or cameras, a distinctive trait." *Id.* at 932. Such use of modus operandi evidence is rare, and the similarities must be specific and detailed and clearly set the particular offense apart from the general body of such offenses. *See McCormick on Evidence* § 190 at 801–803 (4th ed.1992) (not-

novitz's possession of the sexually-explicit magazines tended to show that he had an interest in looking at gay male pornography, reading gay male erotica, or perhaps even, reading erotic stories about men engaging in sex with underage boys, and *not* that he actually engaged in, or even had a propensity to engage in, any sexual *conduct* of any kind. In any event, propensity evidence is contrary to "the underlying premise of our criminal system, that the defendant must be tried for what he did, not who he is." *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1014 (9th Cir.1995) (internal citations omitted).

Criminal activity is a wildly popular subject of fiction and nonfiction writing—ranging from the National Enquirer to *Les Miserables* to *In Cold Blood.* Any defendant with a modest library of just a few books and magazines would undoubtedly possess reading material containing descriptions of numerous acts of criminal conduct. Under the government's theory, the case against an accused child molester would be stronger if he owned a copy of Nabokov's *Lolita,* and any murder defendant would be unfortunate to have in his possession a collection of Agatha Christie mysteries or even James Bond stories. Woe, particularly, to the son accused of patricide or incest who has a copy of *Oedipus Rex* at his bedside.

In this case the government offered into evidence the text of two out of the dozens of articles from the four "Stroke" magazines and none of the articles from the "Playboy" or "After Midnight" magazines. Undoubtedly there was other reading material in Shymanovitz' residence that was discovered but neither seized nor introduced into evidence. To allow prosecutors to parade before the jury snippets from a defendant's library—the text of two magazine articles and descriptions of four magazines—would compel *all* persons to choose the contents of their libraries with considerable care; for it is the innocent, and not just the guilty, who are sometimes the subject of good-faith prosecutions.

■ It is not only the lack of relevancy that renders the evidence inadmissible under Rule 404(b). The evidence also fails to qualify as a bad act. While certain types of conduct generally condemned by society may constitute bad acts, *see United States v. Brooke,* 4 F.3d 1480, 1484–85 (9th Cir.1993), possession of lawful reading material is simply not the type of conduct contemplated by Rule 404(b). The government has not cited any cases from this or other circuits to the contrary, and we have found none. *See supra* note 8. Further, the government's reliance on Rule 404(b) ignores the "similarity" requirement, which is closely related to the relevancy issue: if introduced to show "knowledge" or "intent," the prior bad act must be *similar* to the offense of which the defendant is charged. *See, e.g., United States v. Vizcarra–Martinez,* 66 F.3d at 1014 (finding possession of drug not to be admissible as proof of intent under Rule 404(b) due to lack of similarity to charged offense of drug manufacture). Here there is simply no doubt that a wide gulf separates the act of *possessing* written descriptions or stories about criminal conduct from the act of *committing* the offenses described. Because the contents of the four magazines and the text of the two articles were not relevant to Shymanovitz's intent, or to any other material element of the sexual misconduct charges, and did not constitute "bad act" evidence, the

---

ing that modus operandi evidence must involve acts by the defendant that are "so nearly identical in method as to earmark [the charged offense] as the handiwork of the accused" and that are "so unusual and distinctive as to be like a signature").

In this case neither the government nor the evidence suggests that the articles describe specific methods of committing the particular offense that were reenacted by the defendant as a part of his alleged criminal sexual misconduct. One article portrayed the purported memories of a man who engaged in sex with his father. The other story was about a priest who was asked by a boy's mother to cure the child of masturbating.

That one or both of these fictional tales included descriptions of oral intercourse and genital fondling, conduct of which Shymanovitz was convicted, is not sufficient to establish it as evidence of Shymanovitz' modus operandi in committing the alleged offenses. The physical conduct in which Shymanovitz allegedly engaged could hardly be construed as either distinctive or remarkable in the universe of sexual offenses against minors. Nor is the fact that the articles portray sexual interactions between a minor and an "authority figure" in any way relevant to the question of modus operandi. Rather, that relationship is in most cases inherent in the crime of a sexual offense by an adult against a minor.

trial court abused its discretion when it admitted the challenged evidence.

■ Even if anything within the magazines were relevant to Shymanovitz' intent, and even if Rule 404(b) were otherwise applicable here, we would find that the evidence would have been highly improper under Rule 403, which bars evidence when "its probative value is substantially outweighed by the danger of unfair prejudice." Most of the evidence regarding the "Stroke" magazines related to adult gay male sex. Thus, the extensive testimony regarding the publications could easily have caused the jury, rightly or wrongly, to infer that Shymanovitz was a gay man. Generally, "[e]vidence of homosexuality is extremely prejudicial." *United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir.1988) (citation omitted) (reversing sexual abuse conviction due to admission of evidence suggesting homosexuality); *Cohn v. Papke*, 655 F.2d 191, 194 (9th Cir.1981) (requiring new trial in § 1983 action when evidence of prior homosexual relationships had been admitted); *United States v. Birrell*, 421 F.2d 665, 666 (9th Cir.1970) (reversing theft conviction due to evidence of homosexuality). Evidence implicating Shymanovitz's sexual orientation was particularly prejudicial because he was being tried on numerous sex offense charges: the jury's inference that Shymanovitz was gay could in all likelihood have caused it also to infer that he deviated from traditional sexual norms in other ways, specifically that he engaged in illegal sexual conduct with minors.

Further, the contents of the magazines suggested to the jury that Shymanovitz was far more than a plain and unadorned homosexual—the introduction of this evidence also suggested that he might be interested in or even engage in other sorts of sexual activity that the jurors would perceive as deviant: incest, auto-fellatio, use of sex toys and leather, and sadomasochism. Again, the suggestion of such pursuits is also highly prejudicial to any defendant, and particularly prejudicial to a defendant accused of sexual misconduct or other related misconduct with minors. Accordingly, we conclude that the admission of the evidence regarding the "Stroke" magazines, including the text of two of its articles, was so prejudicial as to outweigh substantially any probative value it could have had.[10]

■ Having determined that the evidence was improperly admitted, "[w]e must reverse the defendant's conviction unless it is more probable than not that the prejudice resulting from the error did not materially affect the verdict." *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1398 (9th Cir.1990). As discussed above, the evidence, which strongly suggested that Shymanovitz was homosexual and otherwise sexually "deviant," was highly prejudicial. Moreover, the jury was exposed to lurid and detailed descriptions of the contents of the magazines at several different stages of the proceedings, including Officer Blas' graphic testimony, which was extensively repeated and referred to by the prosecutor during both her initial closing and rebuttal arguments.[11] Any review of the prosecutor's closing argument—from her spelling of the word "Stroke" for the jury to her digression into the usage of anal beads—compels one to conclude, first, that her mission was to shock the jury with descriptions of sexual practices that must have seemed rather foreign and, second, that the mission was undoubtedly a successful one. The introduction of this evidence served only the highly improper and offensive purpose of advising the jury that Shymanovitz was probably homosexual or otherwise

---

**10.** Because we conclude that the admission of the "Stroke" magazines, including the two articles, is reversible error, we do not consider whether it was error to admit into evidence any of the other items found in Shymanovitz' residence.

**11.** We also note that the government's current justification for offering the magazines—to show intent—like its earlier purported justifications, appears to be essentially a pretext. If the magazines were truly to serve such a purpose, there was simply no need for the prosecutor to elicit such elaborate and specific testimony regarding the entire contents of the magazines rather than just the contents of the two articles. The government's conduct indicates that it used the evidence of the "Stroke" magazines in order to convince the jury that Shymanovitz was a perverted person who was prone to do bad things and to exploit its prejudices and fears as to his character. The introduction of evidence for such purposes is, of course, "precisely the type of abuse that Rule 404 was designed to prevent." *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1015 (9th Cir.1995).

"sexually deviant" and, therefore, a likely child molester. No limiting instruction could have possibly cured the prejudicial effect, and in any case the district court's instruction was extremely general as well as flawed. *See Gillespie*, 852 F.2d at 479 (finding curative instruction inadequate to remove prejudice caused by evidence of homosexuality).[12]

In light of the highly inflammatory nature of the improperly admitted evidence, which was compounded by the prosecutor's untempered and provocative references to it during summation, we simply cannot say that the introduction of the evidence was harmless. This case turned on whether the jury believed Shymanovitz' testimony or that of the boys, and his defense depended almost entirely on the jury's assessment of his credibility and character. Because in our society homosexuality—and indeed any other sort of deviation from the norm of heterosexual procreative sex—is often equated with indecency, perversion, and immorality, and gay persons are often greeted with distrust and suspicion, particularly in their interactions with children, we cannot assume that the jury's decision was not affected by biases and prejudices. Instead, we believe it not only just probable, but rather highly likely, that the evidence had the precise effect upon the jury that was intended, and that the jury's verdict was materially affected by it. *See Gillespie*, 852 F.2d at 479 (reversing conviction when evidence of homosexuality was improperly admitted and when "verdict probably depended on the jury's assessment of the credibility and character of" defendant); *United States v. Brooke*, 4 F.3d 1480, 1488 (9th Cir.1993) (reversing conviction when improper character evidence was admitted, when verdict depended on credibility and character of defen-

dant, and when government made repeated references to improper evidence).

## CONCLUSION

The government's introduction of highly prejudicial evidence against Shymanovitz tainted the fundamental fairness of his trial. We find it likely that the jury's verdict was materially affected by this improper testimonial and demonstrative evidence. Accordingly, we reverse Shymanovitz' conviction and remand for further proceedings.[13]

**REVERSED AND REMANDED.**

---

12. The court instructed the jury as follows:
   You have heard evidence of other acts by the Defendant, such as the possession of various magazines and articles therein, and of acts upon minors other than the victims named in the Indictment, at or about the time of the events. You may consider that evidence only as it bears on the Defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or accident, and for no other purpose.
   In addition to being insufficient to cure the amount of harm caused by the improperly admitted evidence, the instructions were incorrect be-

cause, as discussed above, the contents of the magazine had no relevance to Shymanovitz's intent or any other permissible factor.

13. Because we find reversible error due to the evidence that was admitted, we do not decide Shymanovitz' other claims, including his claims related to the trial court's decisions on the admissibility of expert testimony. We note, however, that the trial court should have permitted the defense to present expert testimony to rebut the government's expert testimony regarding possible explanations for inconsistencies in some of the alleged victims' testimony.